## EX PARTE J. E. McCOY.

No. 3026.   Decided Nov. 2, 1904.

**1.—Habeas Corpus—Evidence.**

There was no error to refuse the relator to show in the court below that the wife of deceased who was a State's witness, was frightened by reason of the fact that she was told that if she should swear that deceased had a knife, at the time relator shot him, the officers would arrest her for the murder of her husband; no previous contradictory statement of the witness having been made.

**2.—Same—Ungovernable Temper May be Shown.**

The court erred in not permitting relator to show by the wife of deceased, that her husband had an ungovernable temper.

From Mitchell County.

Appeal from an order of Hon. Jas. L. Shepherd, district judge, committing relator upon a charge of murder without bail.

The principal State's witness testified that she was the wife of deceased, that she was not living with him at the time of the killing, but was staying with her brother Wm. Schrum, who had rented the place where the difficulty occurred from deceased; that on the day of the homicide, the witness, Schrum, and others including relator were at her said brother's place in the garden; that deceased came there and said: "What are you doing here, what do you mean!" Relator replied: "Stop, get out!" Deceased was coming towards witness and she supposed he had a knife in his hand, but she never saw the knife, however, but he was 'working his fingers; he turned towards relator and came within five or six feet of him, relator telling him to stop; that relator shot over the head of deceased and the latter lunged at relator after the first shot, as though he had a knife but she never saw a knife; that then relator shot a second time and deceased looked like he was shot in the breast and turned and left; that witness was ten or fifteen feet from deceased when he went towards relator; that deceased made the attack with his right hand; that she heard of deceased's death; that he never sent for her; that they never told any one that deceased was shot, who did not act like he was shot; that deceased had threatened to kill witness; that she and others went back to Colorado; that relator was arrested that night; that she believed relator came to the garden to look at the crop; that witness had her child buried in their graveyard and her brother wanted his child buried beside hers, to which deceased objected; that they buried her brother's child there in the morning and the difficulty occurred in the afternoon; that she and others were in the garden gathering peas, when deceased came up; that the deceased addressed her, when he said: "What are you doing, what do you mean?"; that witness said: "He will kill us all!" and started off; she said it because she was afraid of deceased; that she thought he had come to kill her; that he looked like he was mad and was coming in a fast walk; that he walked the same way towards relator, who told him to get out; that deceased replied he would do no such thing; that relator backed off three or four steps; that deceased struck at McCoy the relator after first shot over his head; that deceased struck around at McCoy's left side, when McCoy stepped back and shot again; that deceased then left in about same gait he had come; that witness had sued deceased for a divorce and got out an injunction against him to prevent him from beating and abusing her.

Relator testified that he had loaned his hack, which he used in traveling around selling pictures and poultry compound, to Schrum, so he could bury his child that morning; that in the evening the persons above enumerated met at the garden to gather vegetables, not by appointment, however, and while there deceased came up, and the difficulty occurred pretty much as Mrs. Wiley, deceased's wife, had stated, only with this difference: that deceased made for his wife holding an open knife behind

him; he was mad; his wife fainted and said something about deceased wanting to kill us; "I then asked Wiley to stop and to get out; he then turned and came towards me; he had his knife in his right hand, when he made the first step towards me; I pulled my gun, saying: 'You stop, you don't cut me up!' I then said again, 'Stop,' and saw it had no effect on him, then I cursed him, saying I would kill him, calling a son-of-a-bitch and fired over his head to scare him; he struck at me with his knife and cut my coat and suspenders and cut through the leather of my pocket book when I shot him, firing the second shot; I was backing at the time, etc. Just as I shot him he said 'God!' and wheeled around and left; I could have shot him when he left, I did not try to shoot him any more and did not know I had shot him from the way he walked. I knew his reputation as a violent dangerous man and for cutting people with knives. I came to the court house to swear out some papers and was arrested." On cross-examination relator stated that deceased had told him not to help deceased's wife in any way, or he would find it hard to get his breath; that relator was carrying his pistol to defend himself against another person who had stolen a cow from him, etc.

The deceased made a dying declaration in which he stated that another person by the name of Hyde shot him; that the man who did the shooting had a pistol in his bosom and ordered him off the place and called him a son-of-a-bitch and told him if he moved a muscle he would kill him; that he then shot at deceased twice; that after the first shot deceased grabbed at the pistol and then he was shot again; that he, deceased, had no knife in his hand.

*Felix G. Thurmond,* for relator.

*Howard Martin,* Assistant Attorney-General, for the State.

BROOKS, Judge.—Appellant sued on a writ of habeas corpus before the Hon. Jas. L. Shepherd, judge of the 32nd judicial district, of which Mitchell County is a part. Upon the hearing of the application relator was remanded to the custody of the officers without bail, and appeal was prosecuted.

The first bill of exceptions shows that defendant, on cross-examination of the State's witness, Mrs. Mary T. Wiley (wife of deceased T. M. Wiley) asked, and could have proven by her that in a day or two after relator was arrested and placed in jail, Tom Kidd and Will Schrum were arrested, and also placed in jail, where relator was confined; that on the 4th of August, 1904, the officers, to wit: the sheriff and the rangers, carried Mrs. Wiley to the court house, and then brought her brother (Will Schrum) out of jail to witness; then had Schrum take witness off to one side, and talk to her privately; and he (Schrum) told witness that if she swore that deceased had a knife at the time relator shot him, said officers would arrest her for the murder of her husband (T. M. Wiley)

and put her in jail; that this scared and frightened her. As presented by this record we see no error in the ruling of the court excluding this testimony. No previous contradictory statement of the witness had been made and her testimony in the main seems altogether favorable to relator. We know of no rule by which relator could bolster and strength the testimony of said witness in his behalf in the manner above detailed. If the witness had testified for relator, and the adverse side should have proven contradictory statements to that testified, then certainly, under the rules of law, relator would have had the right to prove witness had made statements in consonance with her testimony at other and different times, but the testimony here sought to be elicited does not come within the rule stated.

Bill No. 2 complains that the court erred in refusing to permit Mrs. Mary T. Wiley to prove that deceased (her husband) had an ungovernable temper. We understand the rule to be that, where a party knows the disposition of the deceased, such knowledge can be testified to in any court. If the deceased should have been an amiable man, slow to anger, this would have been admissible. If he was a man of ungovernable temper, this equally might become pertinent testimony.

The only remaining question is, did the court properly refuse relator bail. In our opinion, relator is entitled to bail. The testimony is not of that character which authorizes this court to refuse bail. Accordingly we fix the amount of relator's bail at the sum of two thousand dollars, and upon the giving the same in the terms of the law he will be released from custody. The judgment of the lower court is reversed.

*Reversed and bail granted.*